# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**RANDY MICHAEL BULLOCK,**

       **Plaintiff,**

                                   **Civil Action 2:11-cv-00257**

**vs.**                                **Judge Gregory L. Frost**

                                   **Magistrate Judge E.A. Preston Deavers**

**COMMISSIONER OF SOCIAL
SECURITY,**

       **Defendant.**

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

Plaintiff, Randy Bullock, filed this action seeking review of a final decision of the

Commissioner of Social Security  ("Commissioner") denying his applications for social security

disability insurance benefits and supplemental security income.  In his applications, which he

filed on June 6, 2006, Plaintiff alleges he has been disabled since May 13, 2006, due to left knee

problems.  ( R. at 155-59, 160-63, 175.)

After initial administrative denials of his claim, Plaintiff appeared and testified at a

hearing before an Administrative Law Judge ("ALJ") on August 4, 2009.  ( R. at 10-46.)  A

medical expert and vocational expert also testified at the hearing.  ( R. at 44-57.)  On August 27,

2009, the ALJ issued an unfavorable decision denying benefits.  ( R. at 66-74.)  This decision

became the final decision of the Commissioner when the Appeals Council denied review on

March 2, 2011.  ( R. at 1-6.)

Plaintiff thereafter timely commenced this civil action. In his Statement of Errors, Plaintiff primarily contends that the ALJ erred in evaluating the opinion evidence of the treating physician and medical expert; that the ALJ should have concluded that he met the listing requirements within §1.03 of 20 C.F.R. Part 404, Subpart P, Appendix 1; and that the ALJ erred in determining that Plaintiff could perform a substantial number of jobs. Following the Commissioner's Response in Opposition, the matter is now ripe for decision. For the reasons that follow, it is **RECOMMENDED** that the Court **AFFIRM** the Commissioner's decision.

## II. PLAINTIFF'S TESTIMONY

Plaintiff, who was forty six years old at the time of the administrative hearing, has a high school education. (R. at 24, 27, 179.) His past relevant work was as a press operator for a newspaper. (R. at 176, 185.) At the time of the hearing, Plaintiff was 5'11" and weighed 340 pounds. (R. at 28.)

At the administrative hearing, Plaintiff testified that he could no longer work due to pain, particularly in his left knee. (R. at 31.) Even before his alleged onset date, Plaintiff noted that he walked with a limp. (R. at 32.) Plaintiff described that his pain started in his left knee and radiated up his leg and to his back. (*Id.*) He also reported that he experienced numbness as well as sharp pains in his left knee and leg. (R. at 21–22.) Plaintiff indicated that the pain in his knee was constant and throbbing. (R. at 26.) Plaintiff testified that he underwent total knee replacement in January 2007 and still required a cane when he stands or walks. (R. at 32, 35, 41.) Plaintiff also received medication and underwent physical therapy for his pain. (R. at 32–33.) He stated that he elevates his leg to relieve his pain. (R. at 27, 41.)

In addition to his knee condition, Plaintiff reported having hernia surgery and asthma.

(R. at 33–34.)  Additionally, Plaintiff testified to experiencing muscle cramping and spasms in his abdomen.  (R. at 43.)  Finally, Plaintiff noted that he received cortisone shots in his right leg due to soreness that resulted from favoring his right side.  (R. at 34.)

On a typical day, Plaintiff indicated that he would watch television as well as lie in bed. (R. at 35–37.)  He helped his children with their homework, read, and occasionally went with his wife to the store.  (*Id.*)  Plaintiff also stated that he was occasionally able to visit his father's house.  (R. 36.)  Plaintiff said that his wife did the household chores and that his son helped her with yard work.  (*Id.*)  Plaintiff reported that he was still able to drive, and did so once or twice per week.  (R. at 22.)  The longest he was able to drive without stopping was twenty to thirty minutes.  (R. at 22–23.)  Plaintiff suggested that he had difficulty with stairs.  (R. at 25.)  He estimated that he could walk and stand fifteen to twenty minutes before he would need to sit or lie down.  (R. at 41–42.)

### III.  MEDICAL RECORDS

A.  <u>Treatment Notes</u>

Darrin Kuczynski, M.D., an orthopedic surgeon, treated Plaintiff from January to October 2006.  (R. at 247–64, 280–300.)  In January 2006, Plaintiff presented with left knee pain, which was worse with activity including prolonged walking, standing, and steps.  (R. at 247.)  Upon examination, Dr. Kuczynski noted findings of mild effusion and profound medial joint line tenderness.  (*Id.*)  X-rays demonstrated degenerative joint disease with a predominant medial component.  (*Id.*)  Dr. Kuczynski diagnosed "left knee pain due to developing [degenerative joint disease] prominent medial component."  (*Id.*)  Plaintiff received an injection into his left knee. (*Id.*)  Plaintiff continued to report knee pain in March and April 2006.  (R. at 254–55, 258.)

P.L. Soni, M.D., examined Plaintiff on May 17, 2006. (R. at 245–46.) Dr. Soni found reduced flexion of Plaintiff's knees, but full extension of the knees and a normal gait. (*Id.*) X-rays of Plaintiff's left knee demonstrated extensive narrowing of the medial joint space as well as some patellofemoral malalignment. (R. at 246.) Plaintiff's right knee looked practically normal. (*Id.*) Dr. Soni recommended diagnostic and arthroscopic surgery and debridement of Plaintiff's left knee. (*Id.*) Dr. Soni stressed that weight loss was very important. (*Id.*)

On May 18, 2006, Plaintiff returned to Dr. Kuczynski for examination. (R. at 262.) Dr. Kuczynski opined that a repeat arthroscopy would not be beneficial. (*Id.*) Following re-evaluation on July 13, 2006, and after reviewing Plaintiff's consultation with a joint replacement specialist, Dr. Kuczynski indicated that Plaintiff was not a candidate for joint replacement surgery. (R. at 263.) Dr. Kuczynski concurred with the specialist's recommendation of a brace. (*Id.*) Finally, Dr. Kuczynski concluded that Plaintiff "remain[ed] disabled from his previous employment." (R. at 263.) Later in May 2006, Plaintiff received a Hyalgian injection. (R. at 264.) At this time, Plaintiff also complained of right knee pain. (*Id.*) X-rays of the right knee displayed that the right knee was "much better with minimal loss of articular height and only mild degenerative changes." (*Id.*) Dr. Kuczynski determined that Plaintiff's right knee did not require an aggressive approach. (*Id.*)

Plaintiff continued to see Dr. Kuczynski from August to October 2006. (R. at 280–86.) In August, Dr. Kuczynski reported that Plaintiff was using a cane in addition to his brace. (R. at 284.) Later that month, Plaintiff stated that he was having problems with both knees. (R. at 284.) Plaintiff received injections in both knees at this time. (*Id.*) On October 18, 2006, Plaintiff indicated that he was still experiencing pain in his left knee. (R. at 280.) Dr. Kuczynski

discussed knee replacement surgery with Plaintiff and referred him to a knee subspecialist. (*Id.*)

On November 16, 2006, Plaintiff first saw John Reister, M.D., an orthopedic surgeon. (R. at 307–10.) Examination findings included normal gait and station; full range of motion in the knee; no instability; and tenderness along the medial joint line. (R. at 308.) Dr. Reister diagnosed Plaintiff with arthritis in his left knee. (R. at 309–10.) Dr. Reister recommended left knee replacement surgery. (R. at 310.)

Plaintiff had left knee surgery on January 15, 2007. (R. at 314.) Dr. Riester discharged Plaintiff four days later, noting that Plaintiff was progressing well with no complications. (*Id.*) Upon discharge, Dr. Reister reported that Plaintiff had "immediate range of motion, full weight bearing, [and] no restrictions." (R. at 314.) In February 2007, Dr. Riester noted Plaintiff was recovering well from his knee replacement surgery. (R. at 335.) X-rays of Plaintiff's knee showed that his prosthesis was well aligned and well fixed. (*Id.*) Plaintiff began physical therapy in February 2007. (R. at 360–61.)

Dr. Riester continued to monitor Plaintiff's post-operative progress from March through August 2007. (R. at 350–59.) In August 2007, Plaintiff reported a burning pain in his left knee. (R. at 350.) Dr. Riester noted, however, that Plaintiff's knee had good motion and that X-rays were satisfactory. (R. at 351.) Dr. Riester commented that Plaintiff had "more pain than I would expect him to have." (*Id.*)

In October 2007, Plaintiff reported to Dr. Riester that he continued to have swelling and pain. (R. at 396.) He described the pain as dull, but was sharp in certain positions, and rated it as a 4 on a 10 point pain scale. (*Id.*) Plaintiff also reported pins and needles sensations in the lateral aspect of the knee. (*Id.*) He was using a cane when out of the house. (*Id.*) Dr. Riester

found good motion, stability, and extension in Plaintiff's left knee. (R. at 397.)

Plaintiff continued to see Dr. Riester for his knee condition throughout 2008. (R. at 400–11.) Plaintiff consistently reported knee pain throughout the year, typically rating his pain as a 4 on a 10 point scale. (*Id.*) Plaintiff's pain was worse with extended activities such as prolonged walking. (*Id.*) Plaintiff continued to ambulate with a cane. (*Id.*) Dr. Riester routinely found good range of motion, good active extension, and stability upon examination. (*Id.*)

In March and June 2009, Plaintiff complained of swelling, charlie horses, and pain with limping. (R. at 412–18.) Plaintiff reported that he was also experiencing back and right knee pain. (R. at 415.) Following the March examination, Dr. Riester noted that he did feel some shifting, but did not think that the knee was grossly unstable. (R. at 414.) Dr. Riester believed that he could not do much more for Plaintiff and recommended continued exercise. (*Id.*) In June 2009, Dr. Riester noted that Plaintiff has had persistent problems following his surgery. (R. at 417.) He recommended that Plaintiff elevate his leg when at rest. (R. at 417.) Dr. Riester found good extension, flexion, and motion. (R. at 418.) X-rays showed that Plaitniff prosthesis was well fixed and well aligned with no fracture. (*Id.*) He opined "[a]t this point I think [Plaintiff] is disabled from any type of employment for which his qualified." (*Id.*)

B.     Evaluations

Dr. Kuczynski restricted Plaintiff to working no more than 12 hours shifts in both January and March 2006. (R. at 252–53.) In April 2006, Dr. Kuczynski modified Plaintiff's restrictions to indicate that Plaintiff should not work more than eight hours. (R. at 257.) Dr. Kuczynski suggested that Plaintiff's condition would affect his work pace. (*Id.*) On April 12,

2006, Dr. Kuczynski wrote a letter to Plaintiff's employer outlining his condition. (R. at 256.) He diagnosed Plaintiff with bilateral arthritis in his knees for which there is no cure and no significant improvement in the foreseeable future. (*Id.*) Dr. Kuczynski reported that Plaintiff's restrictions were permanent and "include no squatting, kneeling, ladders, minimal steps and self-imposed lifting restrictions as tolerated." (*Id.*) Dr. Kuczynski suggested, however, that these guidelines were "slightly flexible according to his symptoms." (*Id.*) On April 26, 2006, Dr. Kuczynski released Plaintiff to fully duty work due in part to pressure from Plaintiff's employer. (R. at 259–60.) In May 2006, Dr. Kuczynski changed course and indicated that Plaintiff "[m]ay not return to work . . . in any capacity at this time." (R. at 261.)

In August 2006, state agency physician Walter Holbrook, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity. (R. at 265–72.) Dr. Holbrook opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; sit for about six hours in a workday; push and pull within normal limits; occasionally stoop, crouch, and climb ramps and stairs but never balance, kneel, crawl, or climb ladders, ropes, or scaffolds; and manipulate with his hands and fingers within normal limits. (R. at 266–67.) Dr. Holbrook observed that Plaintiff was only partly credible regarding his complaints of knee problems. (R. at 270.) Dr. Holbrook stressed that the objective evidence showed no instability, ambulatory aids, or need for further surgery. (*Id.*)

After reviewing the file in February 2007, state agency physician, Gary Demuth, M.D., also issued an opinion as to Plaintiff's physical functional capacity. ( R. at 338-45.) Dr. Demuth opined that Plaintiff would be able to lift twenty pounds occasionally and ten pounds frequently; sit and stand/walk for about six hours each out of eight; frequently balance and stoop;

occasionally kneel and climb stairs and ramps; and never crouch, crawl or climb ladders, ropes or

scaffolds.  (R. at 339–40.)  Dr. Demuth also found that Plaintiff should avoid exposure to all workplace hazards (machinery, heights, etc.).  (R. at 342.)  Dr. Demuth found Plaintiff only partially credible.  ( R. at 339–45.)

In June 2009, Dr. Riester completed a statement for Plaintiff's disability insurance.  Dr. Riester opined that Plaintiff had "no ability to work" and cited his left-knee swelling, charlie horses, and limp.  ( R. at  432-33.)  He estimated, however, that Plaintiff would be able to return to work in December 2009.  ( R. at 433, 435.)  On July 2, 2009, Dr. Riester wrote a letter summarizing Plaintiff's condition and work ability.  (R. at 431.)  Dr. Riester related that Plaintiff had normal objective findings and indicated that Plaintiff had a "painful left total knee with uncertain etiology." (*Id.*)  He opined that Plaintiff was "unable to work at this time and . . . for the foreseeable future." (*Id.*)  He felt that Plaintiff's wife needed to take care of him due to his limited ability to ambulate.  (*Id.*)

## IV. EXPERT TESTIMONY

A.  <u>Medical Expert</u>

Ronald Kendrick, M.D., testified as a medical expert at the August 2009 administrative hearing.  Dr. Kendrick provided that Plaintiff had bilateral osteoarthritis of his knees, morbid obesity, and asthma.  (R. at 47.)  He noted that Plaintiff's worst impairment was his left knee, as it was the most symptomatic and required total knee arthroplasty.  (*Id.*)  Dr. Kendrick opined that Plaintiff did not meet or equal the musculoskeletal listings within sections 1.02 or 1.03 of 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  With regard to listing 1.03, Dr. Kendrick found a

lack of "repeat procedures." (*Id.*) Dr. Kendrick testified that although the arthroplasty did stabilize Plaintiff's knee he noted, "[u]nfortunately, it did not take away his pain." ( R. at 50.)

In terms of functional ability, Dr. Kendrick testified that Plaintiff could do sedentary work that permitted the use of a cane while standing or walking. ( R. at 48.) Dr. Kendrick opined that Plaintiff could sit for six hours in an eight-hour workday. (*Id.*) Furthermore, Dr. Kendrick concluded that Plaintiff could stand or walk for twenty minutes at a time and for two hours total in a work day. (*Id.*) Dr. Kendrick provided that Plaintiff could not kneel, squat, crawl, or climb ladders or scaffolds. (R. at 48–49.) Plaintiff could bend and climb stairs occasionally. (R. at 49.) With regards to leg elevation, Dr. Kendrick opined that people do a number of things to reduce pain and that leg elevation was not unheard of. (R. at 51.) Dr. Kendrick, however, concluded that leg elevation was not a medical necessity in Plaintiff's case. (*Id.*)

B.      Vocational Expert

Jerry Olsheski, Ph.D., testified at the administrative hearing as a vocational expert. (R. at 51–57.) He classified Plaintiff's past employment as a newspaper press operator as medium, skilled work. (R. at 52.)

The ALJ asked Dr. Olsheski to consider a person of Plaintiff's age, education, and past work experience with the limitations Dr. Kendrick set forth. (R. at 53–54.) Dr. Olsheski provided that such a person could not perform Plaintiff's past work. (R. at 53.) Nevertheless, Dr. Olsheski concluded that such a person could perform various sedentary, unskilled jobs, such as an assembler with 250 local jobs and 160,000 nationally; inspector with 75 local jobs and 50,000 nationally; and hand packer with 100 local jobs and 45,000 nationally. (R. at 54.) Dr.

Olsheski testified that if the ALJ found Plaintiff's testimony to be credible, he would not be able to perform any work. ( R. at 55.)

Plaintiff's attorney asked Dr. Olsheski to consider an individual who was limited to the use of one hand while standing. ( R at 56.) Dr. Olsheski opined that as long as Plaintiff could use both hands while seated, then he could perform the identified jobs. (*Id.*) He further explained that the walking component of the identified jobs simply involved moving from one place to another and did not involve much carrying or lifting. (*Id.*) Dr. Olsheski clarified that the hypothetical person could not perform jobs that required the use of both hands while standing or walking. ( R. at 57.)

## V. ADMINISTRATIVE DECISION

The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act in his August 27, 2009 decision. The ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2011. ( R. at 68.) At the first step of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work

substantial gainful activity since May 13, 2006, his alleged disability onset date.  (*Id.*)

Next, the ALJ determined that Plaintiff has the severe impairments of osteoarthritis of his knees with a history of total left knee replacement; morbid obesity; and asthma.  (*Id.*)  At step three, the ALJ then found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  ( R. at 69.)  Within his discussion of the listing impairments, the ALJ emphasized that he carefully considered Plaintiff's obesity.  (R. at 69–70.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC").  The ALJ concluded that Plaintiff had the ability to perform a reduced range of sedentary work.  ( R. at 70.)  The ALJ assigned the following limitations to Plaintiff's ability to perform sedentary work:

> (1) no standing and/or walking for longer than 20 minutes at a time or two hours total in a workday (requires use of a cane); (2) no kneeling, squatting, or crawling; (3) no more than occasional bending; (4) no climbing of ladders, ropes, or scaffolds; and (5) no exposure to high temperatures or high concentrations of air pollutants, such as dust and fumes.

(*Id.*)

In reaching his conclusions regarding Plaintiff's RFC, the ALJ found that the record supported the assessment of Dr. Kendrick.  (R. at 71.)  Additionally, the ALJ found that the use of a cane when doing limited standing or walking was consistent with Plaintiff's bilateral knee osteoarthritis in combination with morbid obesity.  (*Id.*)  The ALJ noted that Dr. Kendrick found

---

available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

no need for Plaintiff to keep his legs elevated. (*Id.*) The ALJ concluded that Dr. Kendrick's assessment accommodated for the restrictions Dr. Kuczynski suggested. (*Id.*) The ALJ stated that Dr. Riester's objective findings did not support his conclusion of total disability and further emphasized that the determination of disability was a matter reserved to the Commissioner. (*Id.*) The ALJ rejected the opinions of Drs. Holbrook and Demuth in favor of the more restrictive assessment of Dr. Kendrick (*Id.*) Finally, the ALJ concluded that Plaintiff was not entirely credible. (R. at 70, 72.)

Based on the above RFC, the ALJ found that Plaintiff could not perform his past relevant work. ( R. at 72.) The ALJ determined, however, that Plaintiff could perform a significant number of jobs in the national economy. (R. at 72-73.) In reaching his decision, the ALJ emphasized that Plaintiff was limited beyond the full range of sedentary work. (R. at 73.) Although the ALJ referenced the Medical Vocational Guidelines, he ultimately relied on Dr. Olsheski's testimony to conclude that Plaintiff could adapt to a significant number of jobs in the national economy. (R. at 73.) Accordingly, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. ( R. at 74.)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the Commissioner's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

Plaintiff focuses on three primary arguments within his Statement of Errors.[2] First,

---

[2] Within the "Legal Issues" section of Plaintiff's Statement of Errors, Plaintiff raises issues that he does not explain or develop within his briefing. In this Report and Recommendation, the undersigned will focus on the issues Plaintiff develops within his Statement of Errors. Nevertheless, the undersigned finds that the ALJ did not err in considering Plaintiff's subjective complaints of pain and did not fail to consider obesity in considering whether Plaintiff met or equaled the listing impairments.

Plaintiff maintains that the ALJ, in assigning an RFC, failed to adequately account and weigh the medical opinions of record. Second, Plaintiff maintains that the ALJ erred in finding that he did not meet or equal the requirements of listing § 1.03. Finally, Plaintiff maintains that the ALJ erred in finding that Plaintiff could perform a substantial number of jobs.

A.    Medical Opinion Evidence and Residual Functional Capacity

In his Statement of Errors, Plaintiff contends that the ALJ did not properly weigh the medical evidence and erred in assigning Plaintiff's RFC. Specifically, Plaintiff contends that the ALJ erred by failing to address or credit Dr. Kuczynski's opinion that Plaintiff has "self-imposed lifting restrictions." (R. at 256.) Plaintiff also contends that the ALJ should have accounted for Plaintiff's need to elevate his leg within the RFC. For the reasons that follow, the undersigned disagrees with both these contentions.[3]

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 404.1527(d). The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Certain types of opinions, however, are normally entitled to greater weight. (*Id.*) For example, the ALJ generally gives deference to the opinions of a treating source "since these

---

[3] To the extent Plaintiff maintains that the ALJ failed to develop the record, his argument fails. Although an ALJ has an obligation to fully develop the record, "[a]n ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001). In this case, the record contained substantial treatment notes, various medical opinions, and medical expert testimony. Furthermore, as described further below, the record provided substantial evidence for the ALJ's decision. Accordingly, the undersigned finds no error in this regard.

are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 404.1527(d)(2); *Blakley*, 581 F.3d at 408.

If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). In contrast, "'[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record.'" *Blakley*, 581 F.3d at 406 (quoting SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996)). Even when an ALJ does not grant a treating physician's opinion controlling weight, "the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, [and the] supportability of the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)).

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted).

Finally, the ALJ reserves the right to decide certain issues, such as whether a claimant is disabled or a claimant's ultimate RFC. 20 C.F.R. §§ 404.1527(e), 416.927(e). A claimant's RFC is considered "the most [a claimant] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). In assessing a claimant's RFC, an ALJ must consider all relevant record evidence, including medical source opinions on the severity of a claimant's impairments. *See id.*

In this case, the ALJ did not err in weighing the medical evidence and substantial evidence supports the ALJ's RFC assessment. First, the ALJ did not err in considering the opinions of Dr. Kuczynski with respect to Plaintiff's physical restrictions. The ALJ explicitly recognized that Dr. Kuczynski limited Plaintiff to no squatting, kneeling, or ladders, and minimal steps. The ALJ concluded that Dr. Kendrick's assessment of Plaintiff's restrictions, which formed the basis for the ALJ's RFC assignment, accommodated these limitations. Plaintiff does not contest this conclusion. Plaintiff, however, faults the ALJ for failing to explicitly address Dr. Kuczynski's opinion that Plaintiff should be subject to "self-imposed lifting restrictions." (R. at 256.) Plaintiff's assertion is unavailing. Dr. Kuczynski's statement as to Plaintiff's lifting ability is not an opinion reflecting the most Plaintiff can still do, as it does not set specific boundaries on Plaintiff's ability to lift. Rather, Dr. Kuczynski's statement appears to be a caution to a previous employer that Plaintiff's ability to lift may be somewhat restricted.

More importantly, the ALJ's determination accounts for Plaintiff's limited ability to lift. The ALJ limited Plaintiff to a reduced amount of sedentary work. Sedentary work involves "lifting no more than 10 pounds at a time" and occasionally lifting light items. 20 C.F.R.

§§ 404.1567(a), 416.967(a).  During the hearing, Plaintiff did not indicate that he had any "self-imposed" lifting restrictions that would take him below the sedentary level.  Finally, no medical source opinion indicates that Plaintiff is incapable of the lifting required for sedentary work.  Under these circumstances, the ALJ did not err by failing to explicitly address Dr. Kuczynski's "self-imposed lifting" statement.

Second, substantial evidence supports the ALJ's finding that Plaintiff did not need to elevate his leg.  Plaintiff points to the June 9, 2009 treatment note in which Dr. Riester advised Plaintiff to elevate his leg when at rest.  (*See* R. at 417.)  Plaintiff also interprets Dr. Kendrick's hearing testimony as supporting Plaintiff's need to elevate his leg to accommodate pain.  Nevertheless, the undersigned finds that Dr. Kendrick's testimony gave the ALJ a substantial basis for excluding a leg-elevation requirement from his RFC.  Based on his review of the entire medical record, Dr. Kendrick described Plaintiff's functional limitations.  Dr. Kendrick did not include the requirement of leg elevation in these limitations.  Instead, Dr. Kendrick testified that there "was no medical necessity for [Plaintiff] to elevate his leg."  (R. at 51.)  At best, Dr. Kendrick testified that people do a lot of things in an attempt to reduce pain and that leg elevation was "not unheard of."  (R. at 51.)  This statement does not support Plaintiff's contention that leg elevation was necessary.  Considering the record evidence, and most specifically Dr. Kendrick's testimony, the ALJ was not required to find that Plaintiff must elevate his leg.

B.      Listing § 1.03

Plaintiff also maintains that the ALJ erred in evaluating Listing § 1.03.  Plaintiff stresses that Dr. Kendrick erred in describing the requirements of Listing § 1.03 during his hearing

testimony.  After review of the record, however, the undersigned finds that substantial evidence supports the ALJ's decision as to Listing § 1.03.

"At step three of the evaluation process, it is the burden of the claimant to show that he [or she] meets or equals the listed impairment." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004).  Accordingly, "[w]hen a claimant alleges that he [or she] meets or equals a listed impairment, he [or she] must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728.  The United States Court of Appeals for the Sixth Circuit has emphasized that ALJ's are not subject to a "heightened articulation standard" in considering the listing impairments.  *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).  Instead, the Court simply reviews whether substantial evidence supports the ALJ's findings.  *See id.*

Listing § 1.03 specifically requires, "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, *with inability to ambulate effectively*, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset."  20 C.F.R. 404, Subpt. P, App. 1 § 1.03 (emphasis added).  The regulations describe inability to ambulate effectively as follows:

> Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 CFR Pt. 404, Subpt. P, App. 1 § 1.00B(2)(b).  The regulations further provide:

> To ambulate effectively, individuals must be capable of sustaining a reasonable

walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.*

In this case, the ALJ found that Plaintiff failed to meet or equal any of the musculoskeletal impairments within the listing requirements. (R. at 69.) The ALJ emphasized that no medical source issued an opinion indicating that Plaintiff met or equaled a listing. Additionally, the ALJ highlighted several relatively normal findings from Plaintiff's treatment notes.

Substantial evidence supports the ALJ's finding that Plaintiff did not meet or equal the requirements of Listing § 1.03. In particular, substantial evidence supports a conclusion that Plaintiff can ambulate effectively within the meaning of the regulations. Although the record reflects that Plaintiff walks with a cane, there is no indication that his cane limits the functioning of both upper extremities. Furthermore, Dr. Kendrick's testimony suggested that Plaintiff is capable of standing or walking for twenty minutes at a time and two hours total each workday. The opinion evidence of the state agency physicians was even less restrictive regarding Plaintiff's ability to walk. Finally, Plaintiff's own testimony suggests that he was able to occasionally go to the store.

Plaintiff emphasizes that Dr. Kendrick's testimony did not properly address the requirements of Listing § 1.03. Dr. Kendrick's testimony regarding a lack of repeat procedures

does, in fact, not align with the requirements of Listing § 1.03. Nevertheless, the ALJ did not rely on this testimony in independently evaluating the requirements of this Listing. Rather, the ALJ stressed that no medical opinion suggested that Plaintiff had a combination of impairments meeting or equaling the listing requirements. Once again, under the circumstances of this case, substantial evidence supports the ALJ's decision.

C.    Vocational Testimony

Plaintiff's final contentions of error concern the ALJ's finding that Plaintiff could perform a substantial number of jobs. Plaintiff contends that the ALJ mechanically relied on the Medical Vocational Guidelines despite finding that Plaintiff could not perform the full range of sedentary work. Plaintiff also challenges the vocational expert's testimony regarding the definition of sedentary work.

When a claimant's capacity to do work matches the capacity levels in the Medical Vocational Guidelines, "the guidelines determine whether significant numbers of other jobs exist for the person or whether that person is disabled." *Range v. Soc. Sec. Admin.*, 95 F. App'x 755, 757 (6th Cir. 2004). When a claimant's restrictions do not exactly match the capacity levels within the guidelines, the guidelines become a framework and the ALJ is "entitled to rely on the testimony of a vocational expert in reaching his [or her] decision." *Id.* The regulations define the sedentary capacity level as follows:

> Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

20

In this case, to the extent Plaintiff argues that the ALJ mechanically relied on the Medical Vocational Guidelines, he is simply incorrect. In reaching his decision, the ALJ recognized that if Plaintiff could perform the full range of sedentary work, the Medical Vocational Guidelines would direct a finding of disability. The ALJ recognized, however, that Plaintiff had additional limitations beyond the sedentary level. Accordingly, the ALJ relied on the vocational expert's testimony to determine that Plaintiff could perform a substantial number of jobs.

Plaintiff's assertions as to the vocational expert testimony are also unpersuasive. Plaintiff takes issue with Dr. Olsheski's testimony that sedentary work "may" require walking or standing. Plaintiff maintains that walking or standing is required under the definition of sedentary work set forth in the regulations. Nevertheless, Plaintiff's contention does not affect the outcome of this case. Regardless of the proper definition of sedentary work, the vocational expert's testimony as to job availability was in response to the restrictions that Dr. Kendrick opined inhibited Plaintiff's physical abilities. Accordingly, the vocational expert considered a person who could stand or walk, with the use of a cane, twenty minutes at a time, for two hours total in a workday. Dr. Olsheski opined that such a person could perform multiple sedentary unskilled jobs such as an assembler and inspector. Furthermore, Dr. Olsheski testimony suggested that these jobs would still be possible if such a person was only able to use one hand while walking or standing as long as such a person could use both hands while seated. (R. at 56–57.) Because the ALJ's ultimate RFC was consistent with the limitations considered in the vocational expert's testimony, the ALJ did not err by relying on this testimony.

## VIII. CONCLUSION

For the reasons above, it is **RECOMMENDED** that the Court **AFFIRM** the

Commissioner's decision.

## IX.  NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  February 8, 2012                              /s/ *Elizabeth A. Preston Deavers*
                                                    Elizabeth A. Preston Deavers
                                                    United States Magistrate Judge